1
2
3
4
5
6
7

8              UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   FELIX LOPEZ,                          No.  1:15-cv-00940-LJO-JLT (HC)

12              Petitioner,               **FINDINGS AND RECOMMENDATION
                                          TO DENY PETITION FOR WRIT OF**
13        v.                              **HABEAS CORPUS**

14   CLARK E. DUCART,                     **[TWENTY-ONE DAY OBJECTION
                                          DEADLINE]**
15              Respondent.

16

17        On May 31, 2011, Petitioner was sentenced to an indeterminate sentence of 50 years-to-

18   life for his conviction of gang-related murder and other charges.  In this action, Petitioner claims

19   defense counsel rendered ineffective assistance, the trial court wrongly admitted evidence of gang

20   membership, there was insufficient evidence supporting the murder conviction, the jury

21   instruction on causation was inadequate, and the jury instructions on provocative act murder were

22   incorrect.  The Court finds that the state court rejection of these claims was not contrary to, or an

23   unreasonable application of, Supreme Court precedent and recommends the petition be **DENIED.**

24   **I.      PROCEDURAL HISTORY**

25        As stated above, Petitioner was convicted in the Stanislaus County Superior Court on May

26   31, 2011, of: murder (Cal. Penal Code § 187); shooting at an occupied building (Cal. Penal Code

27   § 246); being a felon in possession of a firearm (Cal. Penal Code § 12021.1); participation, willful

28   promotion, and assistance of a criminal street gang (Cal. Penal Code § 186.22(a)); and attempting

1   to dissuade a witness from testifying (Cal. Penal Code § 136.1(a)(2)).  (Doc. No. 1 at 15.)  He was

2   sentenced to serve an indeterminate term of 50 years-to-life.  (Id. at 1.)

3         Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth

4   DCA").  The Fifth DCA affirmed the conviction in a reasoned decision.  People v. Lopez, 208

5   Cal.App.4th 1049 (2012).  Petitioner next filed a petition for review in the California Supreme

6   Court.  The petition was summarily denied.  (LD[1] 14, 15.)

7         Petitioner next filed habeas petitions in the Stanislaus County Superior Court, Fifth DCA,

8   and California Supreme Court.  (LD 16, 17, 19.)  The petitions were denied at all levels.  (LD 16,

9   18, 20.)

10         On June 10, 2016, Petitioner filed the instant Petition for Writ of Habeas Corpus in this

11   Court.  (Doc. No. 1).  Respondent filed an answer on October 16, 2015.  (Doc. No. 15).

12   Petitioner filed a Traverse to Respondent's answer on December 2, 2015.  (Doc. No. 19.)

13   **II.   FACTUAL BACKGROUND**

14         The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[2]:

15   **Prosecution Evidence**

16              ***Alonzo Gonzalez***

17
18   Alonzo Gonzalez (Gonzalez) was the owner of Pushing Ink Tattoo Studio (the tattoo shop) in January 2004. In his younger days, Gonzalez was involved in gangs but dropped out about 16 years before when his son was born. He understood that when a gang labeled someone "no good," it meant someone was bad and could be beaten up or even killed. Similarly, when a gang put a "green light" on someone, it meant the person was "no good" and a gang member could attack this person.

19
20

21   Gonzalez met Paul Bargas when Bargas brought his girlfriend in for a tattoo. He also tattooed Bargas. Bargas became a friend and often would come to the tattoo shop. Gonzalez met Henry Wernicke when Wernicke came into the tattoo shop with Bargas.

22

23   In January 2004, Gonzalez went to the apartment of Daniel Lopez hoping to resolve a dispute between Daniel Lopez's girlfriend and Gonzalez's brother's girlfriend. Bargas, who was at the tattoo shop, followed Gonzalez to the apartment. As Gonzalez was talking with a woman in the doorway, Daniel Lopez said, "that's Paul Bargas. He's no good. Green light on Paul Bargas." Gonzalez told Bargas to

24

25

26

----

[1] "LD" refers to the documents lodged with the Court by Respondent on October 29, 2015.

[2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will rely on the Fifth DCA's summary of the facts.  Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

27

28

leave. Daniel Lopez and two other men followed Bargas when he left.

The next day Daniel Lopez came into the tattoo shop with Lopez. Gonzalez told the two he did not want his brother to have any problems with them. Lopez told Gonzalez that Bargas was "no good" and, if Gonzalez continued to be friends with Bargas, he also would be "no good." Lopez wrote his phone number on a piece of paper and told Gonzalez to call him if Bargas showed up at the tattoo shop.

The following day Gonzalez was in the tattoo shop with Mario Sanchez when Bargas and Wernicke arrived. A few minutes later Lopez and Michael Valles entered the shop. Valles took off his gloves and probably shook hands with Gonzalez. Valles then put out his hand to shake with Bargas. Bargas backed up, refusing to shake hands.

Lopez said, "That's Paul Bargas. He's no good." Gonzalez felt that something was going to happen, so he said they had to take it "somewhere else." Gonzalez saw Lopez make a movement with his hands towards the waistband of his pants. He then heard a gunshot from behind him. Gonzalez ran out of the tattoo shop, and he was leaving, he heard numerous gunshots.

Gonzalez returned to the tattoo shop a few minutes after the gunshots stopped. The only person in the shop was Valles, who was lying on the floor. Gonzalez did not see any weapons on Valles at any time that day. Valles asked Gonzalez to help him up. Gonzalez told him to stay on the floor and he would call for an ambulance. Linda Gonzalez, Gonzalez's mother, appeared at the shop at that time.

In May 2005, Gonzalez was called to testify in this matter. He went to the courthouse with his mother and Mario Sanchez. He saw Lopez in the hallway, out of custody. When Lopez walked by Gonzalez, he heard Lopez and Lopez's sister say, "Fucking snitches." In the gang world, a snitch is the same thing as an informant, which is a bad thing.

### *Linda Gonzalez*

Gonzalez is Linda Gonzalez's son. She lived across the street from the tattoo shop. She was in her kitchen when she heard shots being fired from in front of the tattoo shop. She left her apartment and saw Lopez coming from the direction of the tattoo shop. Lopez said he had been shot and was holding his abdomen. Linda Gonzalez ran across the street to the tattoo shop. Gonzalez was upset and crying.

Linda Gonzalez also heard the comments made by Lopez in the courthouse in May 2005. She heard Lopez and a female voice say, "Snitches, you shouldn't be here."

### *Mario Sanchez*

Sanchez went to Gonzalez's tattoo shop about 5:00 p.m. on the day of the shooting. He was visiting with Gonzalez when Bargas and Wernicke arrived.

Sanchez went into the bathroom to clean some of the tattooing equipment. While he was doing so, he heard the front door open. Sanchez heard Valles say, "What's the matter? You don't shake hands?" Bargas responded, "I'm not going to shake your hand." Sanchez heard a voice ask, "Are you Paul Bargas?" Bargas denied that he was and then Lopez said, "That's Paul Bargas." A voice also said, "You're Paul Bargas. You're no good." Right after that Sanchez heard gunfire and he ran out the back door. As he was running out, he saw Bargas with two guns in his hands

shooting downward. Police officers had arrived by the time Sanchez returned to the tattoo shop.

Sanchez also confirmed the comments that were made in the courthouse in May 2005. He heard Lopez say "snitches" as he, Gonzalez, and Linda Gonzalez walked by.

### *Paul Bargas*

Bargas reviewed his criminal history, which began when he was about 15, and his gang involvement, which began shortly thereafter. He admitted he was a member of the Nortenos criminal street gang and associated with other gang members. Bargas explained that someone who informed on a fellow gang member to the police would be labeled "no good" and subject to consequences.

In 1998 Bargas was driving a vehicle and Jose Ochoa was the passenger. Ochoa shot a gun from the vehicle and injured a rival gang member. Bargas was arrested and identified Ochoa as a passenger in the vehicle at the time of the shooting. Bargas spent about nine months in the county jail, where he learned how to survive as a gang member.

In 2000, Bargas was arrested for false imprisonment. While in jail, he saw Lopez. Bargas was jumped by four or five Nortenos while he was sleeping in his cell. While the attackers were beating him, they were telling Bargas he was "no good" and he was a "rat" because he told on "Jose."

Bargas met Gonzalez in 1999 but became friends with him in 2003. Bargas would spend time at the tattoo shop, and Gonzalez told him he would teach him how to tattoo. Wernicke also was Bargas's friend, but he used drugs so he was not always around.

About two days before the shooting, Bargas was at the tattoo shop with Gonzalez and Sanchez. Gonzalez and Bargas went to an apartment complex across the street. As they walked up the stairs to an apartment, Bargas saw Daniel Lopez and two other men he did not know. Daniel Lopez said, "There's Paul Bargas. He's no good." Daniel Lopez also said there was a "green light" on Bargas, which means the same thing as "no good." Bargas understood the term "no good" to mean that he could be attacked, and even murdered, by other Nortenos.

The three men started spitting at Bargas, so he walked away. Bargas could tell the three wanted to fight. The three men followed Bargas into the parking lot in front of the tattoo shop. Bargas grabbed a screwdriver from his car to defend himself. One of the men hit Bargas on the head; Bargas stabbed Daniel Lopez in the arm with the screwdriver. Daniel Lopez told his friends that Bargas had a knife, so the three left.

Over the next two days Bargas heard many comments that the Nortenos were going to kill him because he was "no good" and because he had stabbed Daniel Lopez. Bargas decided to arm himself for protection; he obtained a .38-caliber handgun from a friend. He also had a .22-caliber handgun. He kept the guns in his pocket and attempted to "[lay] low" to avoid a confrontation.

Two days later Bargas had someone drop him off at the tattoo shop. Gonzalez and Sanchez were at the shop. Wernicke came in shortly after Bargas arrived. Bargas had the two guns with him.

About two minutes later, Valles and Lopez entered the tattoo shop. Bargas immediately thought the two were going to attack him. The two men split up in the shop. Valles said something to Gonzalez that Bargas did not hear. Lopez was pacing. Bargas was concerned about being attacked, but was waiting to see if anything would happen.

Valles approached Bargas and asked if he was Paul Bargas while extending his hand as if to shake hands. Bargas backed up because he knew that shaking hands was a trick that Nortenos used to distract the target of an attack. When Bargas did not answer, Lopez identified Bargas and said he was "no good." Bargas saw Lopez pull a gun from under his sweatshirt. Valles moved to grab his gun. Bargas thought his life was in danger so he began shooting. He shot Valles maybe four times. Bargas also shot at Lopez. Lopez aimed his gun at Bargas but then ran out the door. Valles said he was going to kill Bargas, so Bargas shot him again as he was lying on the floor.

Bargas ran out the front door to escape. He saw Lopez a short distance away. Lopez was running away and shooting at Bargas as he was running. Bargas hid behind a truck and returned fire. Bargas was shot in the foot, but he managed to run away from the scene.

Bargas received treatment in San Diego because he did not want to be discovered in the area with a bullet wound. Bargas did not call the police, even though he believed he was defending himself.

Approximately seven months later, parole agents searched Bargas's home and discovered the two guns used in the shooting. Bargas pled guilty to being a felon in possession of a firearm and was sentenced to four years in prison. While in prison he was placed in protective custody at his request.

### *Henry Wernicke*

Wernicke was in custody at the time he testified. In exchange for his testimony, the prosecutor agreed to seek a reduced sentence and period of parole. Wernicke also was provided immunity for his testimony.

Wernicke grew up in the same neighborhood as Bargas, and the two were friends. He met Gonzalez at the tattoo shop about a month before the shooting.

Wernicke had a long criminal history, as well as many periods of confinement for offenses and parole violations. He admitted membership in the prison gang Nuestra Raza, which is affiliated with the Nuestra Familia prison gang.

One of the fundamental rules of gang membership is that no one can attack another gang member unless they have the permission of someone with status. Wernicke knew the gang had determined Bargas was "no good" and Bargas could be attacked at any time. He also knew that Daniel Lopez did not have the authority within the gang to order an attack on Bargas.

Wernicke met Valles while in jail. Valles appeared to be in a position of power in jail. Wernicke had not done any jail time with Lopez.

On the day of the shooting, Wernicke and Bargas were dropped off at the tattoo shop. Gonzalez and Sanchez were present when they entered. Three or four minutes later Lopez and Valles entered the shop and walked to separate locations. Wernicke was scared because he knew both Lopez and Valles had "status" in the

gang, and they were after Bargas.

Wernicke tried to neutralize the situation by introducing himself to Lopez and Valles. Lopez and Valles were "staring" or "mad-dogging" Bargas. Valles attempted to shake Bargas's hand, but Bargas backed away. Wernicke knew that Valles was attempting to neutralize Bargas by grabbing his hand so he could not defend himself. Valles appeared hostile and aggressive. Lopez was watching Bargas closely. Lopez then pulled a handgun from his waistband. Bargas pulled out his gun and the shooting started. Wernicke ran out the back of the tattoo shop.

Wernicke did not see Valles with a gun.

### Patricia and Lawrence Corona

At the time of the shooting, Patricia and Lawrence Corona were stopped at a traffic signal. They observed a man shooting a gun towards the tattoo shop. The man wore a hooded black sweatshirt and was moving away from the tattoo shop while firing his weapon. He appeared to hop in the air each time he shot the gun.

### Thomas Blake

Thomas Blake was a detective with the Modesto Police Department in January 2004 and was assigned to investigate the shooting. He located a blood trail that ran from the tattoo shop towards the apartments across the street. The blood trail ended at the apartment of Daniel Lopez. A search of the apartment located evidence of someone seriously wounded, as well as a .38-caliber semiautomatic gun magazine.

Blake visited Lopez in the hospital the day after the shooting. Lopez said he and Valles had gone into the tattoo shop to look at patterns. They were immediately engaged by a heavyset Hispanic male. This man said he knew Lopez and Valles. When Valles went to shake the man's hand, the man pulled a gun and started shooting at them. Lopez was shot as he tried to leave the shop. He collapsed on the sidewalk outside of the shop. Lopez denied possessing a firearm or shooting a firearm.

Blake testified that Bargas was medium build, not heavyset, while Gonzalez would be considered heavyset.

### John Habermehl

Officer John Habermehl spoke with Lopez at the hospital shortly after Lopez was shot. Lopez stated that he was shot at the tattoo shop by an unknown male. He also asked about the condition of his friend, Valles.

### Forensic Evidence

Investigators recovered a .45-caliber handgun and eight .45-caliber shell casings in the street near the blood trail leading to Daniel Lopez's apartment.  Lopez's thumbprint was found on the magazine from the handgun. The eight recovered shell casings were fired from the handgun.

The bullets recovered revealed that at least two .38-caliber handguns were used during the firefight.

No evidence was recovered that would suggest a gun was fired from the front of the tattoo shop towards the area where Bargas was standing.

Valles was shot five times and died of blood loss due to those injuries. Shots to the chest and abdomen were both fatal wounds.

### *Gang Evidence*

The prosecution's theory of the case was that Valles and Lopez went to the tattoo shop to murder Bargas because Bargas was "no good." The prosecution's gang expert, Richard Delgado, testified that individuals who held leadership positions in the gang had an obligation to make an example out of gang members who had done something that resulted in a "green light" being put on them. By attacking the disfavored gang member, the leaders instill fear and intimidation on other gang members and the public in general, thereby benefitting the gang.

Delgado further opined that Lopez was an active member of the Nortenos criminal street gang, as was Daniel Lopez. Daniel Lopez, however, was not in a position of leadership within the gang.

**Defense Evidence**

### *Lawrence Brookter*

Lawrence Brookter testified as a gang expert on behalf of Lopez. It appears the primary purpose of his testimony was to suggest that Delgado's testimony was incorrect in several respects. He, however, did not suggest that Lopez was not a member of the Nortenos, nor did he testify this crime was not committed for the benefit of the Nortenos.

### *Felix Lopez*

Lopez testified that when he was released from prison in about 1998, he attempted to avoid the gang lifestyle. He no longer associated with gang members and was staying out of jail.

When Lopez learned that Daniel Lopez had been stabbed by Bargas, he met with Gonzalez at the tattoo shop in an attempt to avoid further violence. Lopez thought they had resolved the dispute, but he wanted to bring by a friend that Gonzalez knew (Valles) to make sure the issue was resolved.

Lopez had spoken with Valles on the phone before, so he called him because he thought Valles knew Gonzalez. The two went to the tattoo shop to make sure there would not be any further problems. Lopez did not have a weapon, but he did not know if Valles was armed.

There were three men near the counter when Lopez and Valles entered the tattoo shop. Lopez and Valles shook hands with Gonzalez and Wernicke. Lopez admitted he knew Bargas, but did not recognize him in the tattoo shop. Lopez denied knowing there was a "green light" on Bargas or if the gang had labeled Bargas "no good."

Bargas shook his head and backed up when Valles offered to shake his hand. Wernicke asked Lopez if he was Diablo's brother. Lopez heard gunshots and saw Bargas had a gun in each hand and was shooting Valles. Valles fell to the ground

with a gun in his hand. The gun fell out of Valles's hand and landed near Lopez's foot. Lopez grabbed the gun and tried to shoot at Bargas, but the gun was jammed.

Lopez was shot at least twice but ran out of the tattoo shop. He checked the clip in the gun to see if it had bullets and then put the clip back in the gun and kept running. He heard more gunshots, so he pulled the slide back on the gun and started shooting at Bargas, who was near the door of the tattoo shop. Lopez dropped the gun when the ammunition was exhausted. He ran to Daniel Lopez's apartment and was taken to the hospital.

Regarding the incident with Gonzalez at the courthouse, Lopez said he was at the courthouse because of the possession of a firearm charge. The hearing was moved from one department to another. He was upset because he did not want to be there and he was required to move from one department to the next. He said to his sister something like "This is a bitch." He was not attempting to intimidate anyone, nor did he realize that Gonzalez was nearby.

Lopez, 208 Cal.App.4th 1049, 1053–61 (footnote omitted).

## III.    DISCUSSION

### A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Stanislaus County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

### B.    Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

8

determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of  the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result."  Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams, 529 U.S. at 405-406 (2000).

In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'"  Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."  Harrington, 131 S.Ct. at 787-788.

The second prong pertains to state court decisions based on factual findings.  Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500.  A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists."  Id.; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

9

1    To determine whether habeas relief is available under § 2254(d), the federal court looks to

2  the last reasoned state court decision as the basis of the state court's decision.  See Ylst v.

3  Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.

4  2004).  "[A]lthough we independently review the record, we still defer to the state court's

5  ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

6    The prejudicial impact of any constitutional error is assessed by asking whether the error

7  had "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v.

8  Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120

9  (2007)(holding that the Brecht standard applies whether or not the state court recognized the error

10  and reviewed it for harmlessness).

11    C.    Review of Petition

12    The petition presents the following grounds for relief: 1) Defense counsel rendered

13  ineffective assistance by failing to discuss trial strategy with Petitioner resulting in advising him

14  to change his story concerning how he acquired a firearm, failing to investigate a witness (Bruce

15  Perry), failing to challenge the joinder of the witness intimidation charge with the murder charge,

16  failing to investigate a juror who was overheard speaking with the trial judge, failing to perform

17  competently due to health issues, failing to properly investigate the case, and failing to argue the

18  witness intimidation charge in closing arguments; 2) Admission of gang evidence in violation of

19  Petitioner's constitutional rights; 3) Insufficient evidence to support provocative murder charge;

20  4) Inadequate jury instruction on causation; and 5) Incorrect jury instruction on provocative act

21  murder.  (Doc. No. 1 at 17-22.)

22    *1.  Ineffective Assistance of Counsel*

23      a.  Federal Standard

24    Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth

25  Amendment.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of

26  counsel are reviewed according to Strickland 's two-pronged test.  Miller v. Keeney, 882 F.2d

27  1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also

28  Penson v. Ohio, 488 U.S. 75(1988) (holding that where a defendant has been actually or

10

1   constructively denied the assistance of counsel altogether, the Strickland standard does not apply

2   and prejudice is presumed; the implication is that Strickland does apply where counsel is present

3   but ineffective).

4        To prevail, Petitioner must show two things.  First, he must establish that counsel's

5   deficient performance fell below an objective standard of reasonableness under prevailing

6   professional norms.  Strickland v. Washington, 466 U.S. 668, 687-88 (1984).  Second, Petitioner

7   must establish that he suffered prejudice in that there was a reasonable probability that, but for

8   counsel's unprofessional errors, he would have prevailed on appeal.  Id. at 694.  A "reasonable

9   probability" is a probability sufficient to undermine confidence in the outcome of the trial.  Id.

10  The relevant inquiry is not what counsel could have done; rather, it is whether the choices made

11  by counsel were reasonable.  Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

12       With the passage of the AEDPA, habeas relief may only be granted if the state-court

13  decision unreasonably applied this general Strickland standard for ineffective assistance.

14  Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).  Accordingly, the question "is not whether a

15  federal court believes the state court's determination under the Strickland standard "was incorrect

16  but whether that determination was unreasonable–a substantially higher threshold."  Schriro v.

17  Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123.  In effect, the AEDPA standard

18  is "doubly deferential" because it requires that it be shown not only that the state court

19  determination was erroneous, but also that it was objectively unreasonable.  Yarborough v.

20  Gentry, 540 U.S. 1, 5 (2003).  Moreover, because the Strickland standard is a general standard, a

21  state court has even more latitude to reasonably determine that a defendant has not satisfied that

22  standard.  See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)("[E]valuating whether a rule

23  application was unreasonable requires considering the rule's specificity.  The more general the

24  rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

25       Here, the state court identified the appropriate federal standard by applying Strickland.

26  Thus, the only question remaining is whether the state court's determination that defense

27  counsel's representation was neither deficient nor prejudicial, was an unreasonable application of

28  Strickland.  For the reasons discussed below, the Court concludes that it was not.

### b. Failure to Discuss Trial Strategy

Petitioner first alleges that defense counsel rendered ineffective assistance by failing to discuss trial strategy with him.  Petitioner asserts that this failure resulted in counsel advising him to change his story during trial concerning how he acquired the firearm, but this argument is not well-taken.  If counsel advised Petitioner to *change* his story, then counsel necessarily must have known of the petitioner's prior story.  While possibly unethical, it does not follow that had counsel discussed his trial strategy that this would have resulted in counsel *not* advising Petitioner to change his story.

Petitioner argues that further discussion with counsel of trial strategy would have revealed the "need[] [for] certain crucial witnesses to bolster his defense."  (Traverse, p. 19.)  However, Petitioner fails to identify any of these crucial witnesses, whether they would have testified, what their testimony would have been, and how it would have affected the trial. Therefore, the claim is conclusory, and in any case, the alleged error was not prejudicial.

### c. Failure to Investigate Witness Bruce Perry

Next, Petitioner alleges counsel failed to investigate Bruce Perry.  Perry allegedly witnessed the discussion outside the courtroom concerning Petitioner's attempt to intimidate a witness.  Petitioner claims Perry would have testified that he did not say anything to the witness. Respondent correctly points out that Petitioner does not provide any factual support for his allegation.  He does not provide an affidavit from Perry or any other sworn testimony from Perry. In his traverse, Petitioner points to a discussion Mr. Perry had with the trial court as proof of Perry's potential testimony.  (Traverse, Ex. B.)  The Court has reviewed the colloquy between Mr. Perry and the trial court.  The colloquy only addressed the threat uttered by Petitioner's sister, and the fact that Mr. Perry heard her state: "You're a snitch. I don't know why you're here. You don't belong here. You better watch your back."  (Traverse, Ex. B, p. 54.)  With respect to Petitioner, Mr. Perry stated: "Those folks also apparently claim [Petitioner] at some point during that morning made a comment or not, and according to the remittitur that I read yesterday, [Petitioner] apparently testified about his recollection, and witnesses then testified to a slightly different recollection of what those statements were."  (Traverse, Ex. B, p. 54.)  Nowhere does

12

1    Mr. Perry state that those witnesses were wrong and Petitioner did not utter such a threat, or even

2    that he did not hear Petitioner utter a threat.  Therefore, Petitioner fails to demonstrate that Mr.

3    Perry would have provided any favorable testimony, and that any testimony would have altered

4    the outcome of the trial.

5                    d.   Failure to Challenge Joinder of Intimidate Charge with Murder Charge

6            Petitioner also claims counsel failed to argue that the witness intimidation charge should

7    not have been joined with the murder charge.  This claim is completely conclusory.  Petitioner

8    offers no reason why counsel should have made such an argument, how such an argument would

9    have been meritorious, or how he was prejudiced by the joinder of the charges.

10                   e.   Failure to Investigate Juror

11           Petitioner contends a juror was overheard talking to the trial judge outside the presence of

12   counsel.  Petitioner offers nothing more in his petition, but in his traverse he claims another

13   inmate was in the courtroom on another matter when a juror spoke to the judge and informed the

14   judge that she did not want to be there and that she was not in the right state of mind.  Petitioner

15   faults counsel for failing to investigate this juror, because the juror should have been excused.

16   Petitioner posits that because she may not have been in the right state of mind, she might have

17   been coerced into agreeing with the verdict.

18           This claim is completely speculative.  There is no evidence of who this juror was or

19   whether she was in fact on Petitioner's jury panel.  The only evidence Petitioner offers is a vague

20   statement of another inmate who allegedly overheard a statement by an unknown juror in a

21   courtroom.  Petitioner then speculates that this juror must have been on his panel, and then

22   speculates on her state of mind and how it could have had an effect on the trial.  The claim is

23   meritless.

24                   f.   Health Concerns

25           Petitioner argues counsel rendered ineffective assistance due to his poor health.  Petitioner

26   states counsel was taking medication and was clearly occupied with his physical condition and

27   not attentive to the proceedings.  He contends the medical condition kept him from performing

28   the task of representing the petitioner.  The medical condition allegedly prevented defense

1    counsel from investigating the case in order to discover favorable evidence and witnesses.  In his

2    traverse, Petitioner points to a discussion during the trial in which all parties recognized that

3    defense counsel had been ill, nevertheless, all parties agreed that there was no visible impairment

4    and defense counsel's performance was completely professional, ethical and competent.

5    (Traverse, Ex. C.)

6        This argument is also conclusory and unsupported.  The only evidence Petitioner points to

7    in support shows the opposite of what he claims; that defense counsel by all accounts mounted a

8    competent and aggressive defense.  Petitioner also fails to show any prejudice.  He fails to state

9    what favorable evidence or witnesses would have been discovered and how they would have

10   assisted the defense.

11          g.   Failure to Argue Charge of Witness Intimidation

12       In his final claim of ineffective assistance of counsel, Petitioner argues that counsel failed

13   to argue the charge of witness intimidation during closing.

14       Respondent argues the claim is unexhausted.  Respondent states that this particular claim

15   of ineffective assistance was presented to the superior court and appellate court; however, it was

16   not specifically raised to the California Supreme Court.  The Court has reviewed the petition filed

17   with the California Supreme Court.  While the petitioner did present certain ineffective assistance

18   claims in his petition, he did not specifically mention the failure to argue the charge of witness

19   intimidation during closing arguments.

20       Prior to seeking federal habeas relief, a petitioner must exhaust state remedies by

21   providing the highest state court with a full and fair opportunity to resolve the claim.  Rose v.

22   Lundy, 455 U.S. 509, 518 (1982).  To exhaust a claim, a petitioner must have presented his issue

23   before the California Supreme Court "within the four corners of his appellate briefing." Castillo

24   v. McFadden, 399 F.3d 993, 1000 (9th Cir. 2005).  Fair presentation is not met where a claim is

25   raised in a lower state court, but the petitioner fails to specifically set forth the claim in his brief

26   to the appellate court.  Baldwin v. Reese, 541 U.S. 27, 32 (2004).  Therefore, Respondent is

27   correct that Petitioner has failed to exhaust this claim.

28       Regardless of the fact that the claim is unexhausted, it is clearly without merit.  In the

14

1   superior court, the claim was rejected as follows:

2      This court held an evidentiary hearing on the issue of ineffective assistance of
       counsel with respect to Petitioner's assertion that his trial counsel, T.J. Richardson,
3      failed to present an argument to the jury on the issue of Petitioner's
       guilt/innocence on the witness intimidation charge.  Petitioner argues that counsel
4      was ineffective because, according to Petitioner, Attorney Richardson told
       Petitioner that he 'forgot' to raise the issue during argument.  Thus, according to
5      Petitioner, the failure was not a tactical decision, but one of neglect.

6      The court notes that this is the first time this issue has been raised.  Following trial,
       and prior to sentencing, Petitioner was represented first by Mr. Ernie Spokes,
7      followed by Mr. Michael Platt.  Mr. Platt filed a motion for new trial, but only on
       grounds related to the provocative act murder charge.  No mention was made then
8      as to ineffective assistance of counsel, or to the statement purportedly made to
       Petitioner by Mr. Richardson that he "forgot" to argue the intimidation of a
9      witness charge.  In the hearing on the instant petition, counsel for Petitioner argued
       that this charge was so serious that counsel had to be ineffective for not arguing it.
10     But that same argument can be made not only of post-trial motion counsel (Mr.
       Spokes and Mr. Platt), but also of Petitioner himself.  It seems illogical that this
11     issue arises now for the first time, despite the fact that Petitioner could have raised
       that issue with his two highly competent counsel.  Further, counsel presumably
12     read the record prior to the motion for new trial, but did not raise the issue that
       Attorney Richardson failed to argue the witness intimidation charge.
13
       It is more logical that Attorney Richardson made a conscious decision not to argue
14     the intimidation charge.  The main focus of the trial was clearly the provocative-
       act murder charge.  The witness intimidation charge was a minor portion of the
15     trial testimony.   Petitioner's defense was that rather than calling the victims
       'snitches,' he said 'bitches.'  With that as a defense, and in light of the fact that he
16     was facing a murder charge, it is not surprising that counsel did not argue that
       witness intimidation charge.
17

18   (LD 16, pp. 38-39.)

19       Therefore, the superior court rejected the contention that counsel "forgot" to argue the

20   witness intimidation charge, and determined that counsel's failure to argue the charge was a

21   matter of trial strategy given the weak reasoning behind Petitioner's defense to the charge and the

22   fact that the charge was a minor concern compared to the murder charge.  Petitioner offers

23   nothing to rebut the presumption that the state court decision was a reasonable factual

24   determination.

25       Moreover, the Supreme Court has held that "[d]eference to counsel's tactical decisions in

26   his closing presentation is particularly important because of the broad range of legitimate defense

27   strategy at that stage." Yarborough v. Gentry, 540 U.S. 1, 6 (2003).  When counsel focuses on

28   some issues to the exclusion of others, "there is a strong presumption that counsel did so for

1  tactical reasons rather than sheer neglect." Id.  Fair-minded jurists could disagree whether

2  counsel's focus on the murder charge to the exclusion of the witness intimidation charge was a

3  reasonable tactical decision.

4  　　　In sum, Petitioner fails to demonstrate that the state court rejection of his several claims of

5  ineffective assistance of counsel was contrary to, or an unreasonable application of Strickland.

6  The claim should be rejected.

7  　　　　　2.  Gang Evidence

8  　　　Next, Petitioner alleges that the admission of evidence of his gang membership violated

9  his constitutional rights.

10  　　　A federal court in a habeas proceeding does not review questions of state evidence law.

11  Our inquiry is limited to whether the evidence ruling "resulted in a decision that was contrary to,

12  or involved an unreasonable application of, clearly established Federal law, as determined by the

13  Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  With respect to the admission of

14  evidence, there is no Supreme Court precedent governing a court's discretionary decision to

15  admit evidence as a violation of due process.  In Holley v. Yarborough, 568 F.3d 1091, 1101 (9th

16  Cir. 2009), the Ninth Circuit stated:

17
18
19
20
21
> The Supreme Court has made very few rulings regarding the admission of
> evidence as a violation of due process. Although the Court has been clear that a
> writ should be issued when constitutional errors have rendered the trial
> fundamentally unfair, [Citation omitted.], it has not yet made a clear ruling that
> admission of irrelevant or overtly prejudicial evidence constitutes a due process
> violation sufficient to warrant issuance of the writ. Absent such "clearly
> established Federal law," we cannot conclude that the state court's ruling was an
> "unreasonable application."  [Citation omitted.] Under the strict standards of
> AEDPA, we are therefore without power to issue the writ . . . .

22  　　　Since there is no clearly established Supreme Court precedent governing a trial court's

23  discretionary decision to admit evidence as a violation of due process, habeas relief is foreclosed.

24  Holley, 568 F.3d at 1101.  Therefore, Petitioner cannot demonstrate that the state court decision

25  was contrary to, or involved an unreasonable application of, clearly established federal law.  See

26  28 U.S.C. § 2254(d).  The claim should be denied.

27  　　　　　3.  Insufficient Evidence of Murder

28  　　　Petitioner next claims that there was insufficient evidence to support the provocative-act

1  murder charge, and that attempted murder was not proven by the prosecution.

2          a.  <u>State Court Opinion</u>

3      The claim was presented on direct appeal to the Fifth DCA, where it was rejected in a

4  reasoned decision as follows:

> The prosecutor did not suggest that Lopez killed Valles, acknowledging that it was Bargas who shot Valles. Instead, the prosecutor argued Lopez was guilty of murder under the provocative act murder doctrine. This doctrine applies where a defendant's actions are a substantial concurrent cause of the death of the victim, even though the victim was killed by a third person. (*People v. Concha* (2009) 47 Cal.4th 653, 662 (*Concha*).)

> "'When the defendant or his accomplice, with a conscious disregard for life, intentionally commits an act that is likely to cause death, and his victim or a police officer kills in reasonable response to such act, the defendant is guilty of murder. In such a case, the killing is attributable, not merely to the commission of a felony, but to the intentional act of the defendant or his accomplice committed with conscious disregard for life. Thus, the victim's self-defensive killing or the police officer's killing in performance of his duty cannot be considered an independent intervening cause for which the defendant is not liable, for it is a reasonable response to the dilemma thrust upon the victim or the policeman by the intentional act of the defendant or his accomplice.' [Citation.] We later stated that, '[i]n the classic provocative act murder prosecution, malice is implied from the provocative act, and the resulting crime is murder in the second degree.' [Citations.]

> "This statement regarding a classic provocative act murder prosecution is often, but not always, true. Provocative act murder is not an independent crime with a fixed level of liability. [Citation.] It is simply a type of murder. The words 'provocative act murder' are merely shorthand used 'for that category of intervening-act causation cases in which, during commission of a crime, the intermediary (i.e., a police officer or crime victim) is provoked by the defendant's conduct into [a response that results] in someone's death.' [Citation.]" (*Concha, supra*, 47 Cal.4th at pp. 665-666.)

> The prosecutor argued that Lopez was a substantial concurrent cause of Valles's death because Lopez went into the tattoo shop to kill Bargas. Since Bargas killed Valles after he was provoked by Lopez's conduct, the prosecutor argued Lopez was guilty of Valles's murder. In other words, the prosecutor argued that Bargas's act of killing Valles in self-defense was a dependent intervening act that did not relieve Lopez of criminal liability for the natural and probable consequences of his actions.

> We now turn to Lopez's arguments.

> **I. Sufficiency of the Evidence of Murder**

> Lopez contends his murder conviction must be overturned because it was not supported by sufficient evidence in three respects.

17

**Standard of review**

To assess the evidence's sufficiency, we review the whole record to determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime. (*People v. Maury* (2003) 30 Cal.4th 342, 403 (*Maury*).) The record must disclose substantial evidence to support the verdict— i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Id*. at p. 396.) In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury reasonably could have deduced from the evidence. (*People v. Boyer* (2006) 38 Cal.4th 412, 480.) "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]" (*Maury*, at p. 403.) A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

The same standard governs in cases where the prosecution relies primarily on circumstantial evidence. (*Maury, supra*, 30 Cal.4th at p. 396.) We "must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]" (*Ibid*.) "Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053-1054 (*Kraft*).) Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion that the circumstances also reasonably might be reconciled with a contrary finding does not warrant the reversal of the judgment. (*Ibid*.)

**Sufficiency of the evidence that Lopez was attempting to murder Bargas**

Lopez begins by arguing the prosecution was required to prove that he went into the tattoo shop to kill Bargas. While acknowledging there was evidence that Lopez pulled out a gun when he was confronting Bargas, Lopez claims that his intent in doing so was never established. According to Lopez, he could have intended to intimidate Bargas, threaten Bargas, assault Bargas, or shoot Bargas. Since the prosecutor failed to establish his specific intent, Lopez asserts the conviction must be reversed.

The prosecution argued that Lopez intended to kill Bargas, and the trial court instructed the jury accordingly. The evidence to support the prosecution's argument was supplied by those with knowledge of the gang lifestyle.

There was no serious dispute that Bargas had been labeled by the Nortenos as "no good," and gang members had a "green light" to act on this label. Lopez points out that a gang member labeled "no good" was subject to various types of attack, including being assaulted or killed. He also points out that while in jail Bargas was not killed, but merely attacked by other Nortenos.

This was evidence the jury could have considered, but it hardly was all of the relevant evidence. The jury also knew that Valles was an admitted enforcer for the

18

Nortenos and had killed before. Bargas testified that both Valles and Lopez were armed with handguns when they entered the tattoo shop, and both pulled out their weapons. Forensic evidence established that four weapons were fired during the shooting -- the gun Lopez admitted possessing, the .38- and .22-caliber weapons Bargas admitted possessing, and a second .38-caliber weapon.

In addition, two days before the shooting Bargas was assaulted by three Norteno gang members, including Daniel Lopez. Bargas successfully fought them off by stabbing Daniel Lopez in the forearm with a screwdriver. In the two days following that fight, Bargas heard numerous comments that the Nortenos were going to kill him.

The jury logically and reasonably could have concluded from these facts that when Lopez and Valles entered the tattoo shop, they intended to kill Bargas. Additional facts also support this inference.

First, Lopez and Valles did not enter the shop with knives, but with handguns. The use of handguns often results in death.

Second, since Valles was an admitted hit man for the Nortenos, the jury could have inferred that his presence was unnecessary if the intent was to assault Bargas.

Third, the jury could have inferred that since only two men went into the tattoo shop, the intent was to kill, not assault, Bargas. Bargas already had successfully fought off an assault by three gang members. If three could not complete the assault, then it is logical that more than three would be sent to assault Bargas. Since only two went to the tattoo shop, and they were armed with guns, it is unlikely that the intent was to commit an assault.

Fourth, the confrontation occurring inside the tattoo shop suggests an intent to kill Bargas. An assault is more easily accomplished in an open area where the victim can be surrounded. If the intent was to assault Bargas, the gang could have waited for Bargas to leave the tattoo shop.

These facts all support the inference that Lopez and Valles intended to murder Bargas when they went to the tattoo shop. Moreover, there is seldom direct evidence of a defendant's intent. (*People v. Thomas* (2011) 52 Cal.4th 336, 355.) Instead, the jury must infer a defendant's intent from the circumstances surrounding the crime. (*Ibid.*) Here, there was more than adequate circumstantial evidence to support the jury's conclusions that Lopez intended to kill Bargas when he entered the tattoo shop. Simply because the jury could have reached a different conclusion from these circumstances is irrelevant. (*Kraft, supra*, 23 Cal.4th at pp. 1034-1035.)

The only case cited by Lopez to support his argument, *People v. Miller* (1935) 2 Cal.2d 527 (*Miller*), is of no assistance. Earlier in the day in question, Charles Miller threatened to murder Albert Jeans because, according to Miller, Jeans was harassing Miller's wife. Later that day Miller, apparently under the influence of alcohol, approached Jeans in a field in which he and several other people, including the local constable, were working. Miller carried a rifle. At one point Miller stopped, apparently for the purpose of loading the rifle. Jeans fled when he saw Miller approaching. The constable approached Miller and confiscated the loaded rifle without resistance. Miller never raised the gun into a shooting position.

Miller was convicted of the attempted murder of Jeans. The Supreme Court observed the prosecution was required to prove that Miller intended to murder Jeans and had taken a direct but ineffectual act toward the commission of the murder.

(*Miller, supra*, 2 Cal.2d at p. 530.) Preparation alone would not be sufficient. (*Ibid.*) The Supreme Court concluded that under the facts presented "no one could say with certainty whether the defendant had come into the field to carry out his threat to kill Jeans or merely to demand his arrest by the constable. Under the authorities, therefore, the acts of the defendant do not constitute an attempt to commit murder." (*Id.* at p. 532.)

Lopez's acts were not nearly as equivocal as those of Miller. In the past, Lopez had ordered other gang members to assault Bargas. He came into the tattoo shop with another man, both armed with firearms. Both men displayed open hostility towards Bargas. Both men attempted to withdraw their weapons when Bargas "beat them to the draw." This evidence established much more than mere preparation -- it showed several direct acts towards accomplishing the murder of Bargas.

(Resp't's Answer, Ex. A, pp. 12-17.)

        b.    <u>Federal Standard</u>

The law on sufficiency of the evidence is clearly established by the United States Supreme Court.  Pursuant to the United States Supreme Court's holding in <u>Jackson v. Virginia</u>, 443 U.S. 307, the test on habeas review to determine whether a factual finding is fairly supported by the record is as follows: "[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 319; <u>see also</u> <u>Lewis v. Jeffers</u>, 497 U.S. 764, 781 (1990).  Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will petitioner be entitled to habeas relief.  <u>Jackson</u>, 443 U.S. at 324. Sufficiency claims are judged by the elements defined by state law.  <u>Id.</u> at 324, n. 16.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." <u>Id.</u> at 326. Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction.  <u>Walters v. Maass</u>, 45 F.3d 1355, 1358 (9th Cir. 1995).

After the enactment of the AEDPA, a federal habeas court must apply the standards of <u>Jackson</u> with an additional layer of deference.  <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir.

1   2005).  In applying the AEDPA's deferential standard of review, this Court must presume the

2   correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1); <u>Kuhlmann v. Wilson</u>,

3   477 U.S. 436, 459 (1986).

4           In <u>Cavazos v. Smith</u>, __U.S. __, 132 S.Ct. 2 (2011), the United States Supreme Court

5   further explained the highly deferential standard of review in habeas proceedings, by noting that

6   <u>Jackson</u>,

> makes clear that it is the responsibility of the jury - not the court - to decide what
> conclusions should be drawn from evidence admitted at trial. A reviewing court
> may set aside the jury's verdict on the ground of insufficient evidence only if no
> rational trier of fact could have agreed with the jury. What is more, a federal court
> may not overturn a state court decision rejecting a sufficiency of the evidence
> challenge simply because the federal court disagrees with the state court. The
> federal court instead may do so only if the state court decision was "objectively
> unreasonable."
>
> Because rational people can sometimes disagree, the inevitable consequence of
> this settled law is that judges will sometimes encounter convictions that they
> believe to be mistaken, but that they must nonetheless uphold.

14  <u>Id</u>. at 3.

15              c.      <u>Analysis</u>

16          Petitioner fails to establish that no rational trier of fact would have found the essential

17  elements of the crime beyond a reasonable doubt.  Substantial circumstantial evidence was

18  presented from which the jury could have found that Petitioner went into the tattoo parlor with the

19  intent to kill Bargas.  Petitioner and Valles were both armed with firearms, and at some point,

20  they pulled their firearms on Bargas and attempted to shoot him.  Bargas had already been

21  attacked by members of Petitioner's gang, and Bargas had injured Felix Lopez by stabbing him

22  with a screwdriver.  As a result of this, Bargas heard that the Norteno gang would attempt to kill

23  him.  Petitioner stated Bargas was "no good" which meant that Bargas was to be severely beaten

24  or killed.  Valles admitted to law enforcement that for a period of time his job in the Nuestra

25  Familia gang was to beat and kill gang dropouts.  (RT 1346.)  Bargas was a gang dropout.  (RT

26  777, 1052.)  Petitioner engaged Bargas in the tattoo parlor by attempting to shake his hand.  (RT

27  396-97.)  Gang members typically use a handshake to distract the victim while other gang

28  members assault the victim.  (RT 826-27; 1450-52.)  According to a gang expert, Valles was

1   likely attempting to pull Bargas off balance and give Petitioner a clean shot at Bargas.  (RT

2   1452.)

3         Based on the foregoing evidence, there was more than sufficient evidence from which a

4   rational trier of fact could have concluded that Petitioner went into the tattoo parlor with the

5   intent to kill Bargas.  The claim should be denied.

6         *4.  Jury Instruction on Causation*

7         In his next ground, Petitioner alleges the trial court failed to instruct the jury concerning

8   the requirement that the chain of causation be unbroken by an independent superseding cause.

9              a.  State Court Opinion

10        The claim was presented on direct appeal to the Fifth DCA, where it was rejected in a

11  reasoned decision as follows:

> Lopez contends the trial court erroneously instructed the jury in two respects. We
> begin by noting no objection was raised to any of the instructions, and therefore
> any potential issue has been forfeited. (*People v. Virgil* (2011) 51 Cal.4th 1210,
> 1260.) On the merits, the argument fails as well.
>
> [¶] … [¶]
>
> **Failure to instruct that chain of causation must not be broken by an
> independent intervening cause**
>
> The jury was instructed that to convict Lopez it must find beyond a reasonable
> doubt that Valles's death was the natural and probable consequence of Lopez's
> provocative act. The instruction then defined a provocative act as one "Whose
> natural and probable consequences are dangerous to human life, because there is a
> high probability that the act will provoke a deadly response." Next, the jury was
> informed that Valles's death was the natural and probable consequence of Lopez's
> provocative act if the People proved (1) a reasonable person in Lopez's position
> would have foreseen there was a high probability his act could begin a chain of
> events resulting in someone's death, (2) Lopez's act was a direct and substantial
> factor in causing Valles's death, and (3) Valles would not have died if Lopez had
> not committed the provocative act. Finally, the jury was instructed that a
> substantial factor is more than a remote or trivial factor, but it did not need to be
> the only factor that caused Valles's death. [N.4]
>
>> [N.4] The complete instruction as read to the jury stated: "The defendant is
>> charged in Court 1 with murder. A person can be guilty of murder under
>> the Provocative Act Doctrine even if someone else did the killing. To prove
>> that the defendant is guilty of murder under the Provocative Act Doctrine,
>> the People must prove that, one, in attempting to commit the murder of
>> Paul Bargas, the defendant intentionally did a provocative act. Two, the
>> defendant knew that the natural and probable consequences of the
>> provocative act were dangerous to human life and then acted with
>> conscious disregard for life. Three, in response to the defendant's

22

provocative act, Paul Bargas killed Michael Valles. And, four, Michael Valles' death was the natural and probable [consequence] of the defendant's provocative act. [¶] A provocative act is an act whose natural and probable consequences are dangerous to human life because there is a high probability that the act will provoke a deadly response. [¶] In order to prove that Michael Valles' death was the natural and probable [consequence] of the defendant's provocative act, the People must prove that, one, a reasonable person in the defendant's position would have foreseen that there was a high probability that his or her act could begin a chain of events resulting in someone's death. Two, the defendant's act was a direct and substantial factor in causing Michael Valles' death. And, three, Michael Valles' death would not have happened if the defendant had not committed the provocative act. [¶] A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that caused the death. [¶] The People alleged that the defendant committed the following provocative act: He entered the Pushing Ink Tattoo Parlor armed with a loaded .45 caliber pistol, declared to his companion, Michael Valles, 'This is Paul Bargas. He is no good' and drew his .45 caliber pistol inside the tattoo parlor. You may not find the defendant guilty unless you all agree that the People have proved that the defendant committed the provocative act."

Lopez argues there was evidence of an independent intervening cause that broke the chain of causation. Specifically, the jury could have found that it was Valles's act of withdrawing his firearm from his waistband that caused Bargas to defend himself. According to Lopez, the jury was misinstructed because the trial court did not inform the jury that an independent intervening cause would break the chain of causation and absolve Lopez of guilt.

This was the issue addressed by the Supreme Court in *Cervantes*. We already have discussed the facts of that case and the Supreme Court's holding that an independent criminal act is an independent intervening cause absolving the defendant of liability. In reaching this conclusion, the Supreme Court explained the causation aspect in murder prosecutions where criminal liability is predicated on the provocative act murder doctrine.

The Supreme Court began its analysis by noting the cause of a murder is "'an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the death of [the decedent] and without which the death would not occur.' [Citations.]" (*Cervantes, supra*, 26 Cal.4th at p. 866.) The jury in Cervantes's case was instructed with each of these concepts. The Supreme Court also noted that proximate cause is established when the act is directly connected with the resulting injury, meaning that there is "'no intervening force operating.' [Citation.]" (*Ibid.*)

In this case, as in Cervantes, there was an intervening force that acted because neither Lopez nor Cervantes fired the bullets that killed the victim. This fact, standing alone, does not absolve Lopez of liability because he may be criminally liable, even if another cause contributed to the victim's death. (*Cervantes, supra*, 26 Cal.4th at pp. 866-867.) Lopez would be absolved of criminal liability if an independent intervening event caused Valles's death, but he would remain criminally liable if the intervening cause was a dependent intervening cause. (Id. at pp. 868-869.) The issue is the distinction between an independent intervening cause and a dependent intervening cause, which the Supreme Court also explained:

"The principles derived from these and related authorities have been summarized as follows. 'In general, an "independent" intervening cause will absolve a defendant of criminal liability. [Citation.] However, in order to be "independent" the intervening cause must be "unforeseeable … an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause." [Citation.] On the other hand, a "dependent" intervening cause will not relieve the defendant of criminal liability. "A defendant may be criminally liable for a result directly caused by his act even if there is another contributing cause. If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is 'dependent' and not a superseding cause, and will not relieve defendant of liability. [Citation.] '[ ] The consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. [ ] The precise consequence need not have been foreseen; it is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from his act.' [Citation.]" [Citation.] [Citations.]" (*Id.* at p. 871.)

Thus, an independent intervening cause is one that is unforeseeable, while a dependent intervening cause is one that is a normal and reasonably foreseeable result of the defendant's provocative act, i.e., one that a defendant should have foreseen as a possible result of his provocative act.

The jury properly was instructed with these concepts, even though the term "independent intervening cause" was not used. The jury was instructed that the People must prove a reasonable person in Lopez's position would have foreseen there was a high probability that the chain of events started by Lopez would result in someone's death, and that Valles's death would not have occurred if Lopez had not committed the provocative act. The requirement that a reasonable person would have foreseen that someone would die eliminates the possibility that Bargas's action was an independent intervening cause because the jury could not also find Bargas's action was unforeseeable.

Even if the argument had merit, we would not reverse the judgment because, as we explained in the preceding section, Lopez cannot establish the hypothetical error resulted in a miscarriage of justice.

(Resp't's Answer, Ex. A, pp. 26, 30-33.)

　　　　b.　Federal Standard

The issue of whether a jury instruction is a violation of state law is neither a federal question nor a proper subject for habeas corpus relief.  Estelle v. McGuire, 502 U.S. 62, 68 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'") (quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990)); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas").  Indeed, federal courts are bound by state court rulings on questions of state law.  Oxborrow v. Eikenberry, 877

24

1  F.2d 1395, 1399 (9th Cir. 1989).  In addition, "the availability of a claim under state law does not

2  of itself establish that a claim was available under the United States Constitution."  Sawyer v.

3  Smith, 497 U.S. 227, 239 (1990) (quoting Dugger v. Adams, 489 U.S. 401, 409 (1989)).

4      In reviewing an ambiguous instruction, the inquiry is not how reasonable jurors could or

5  would have understood the instruction as a whole; rather, the court must inquire whether there is a

6  "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates

7  the Constitution.  Estelle, 502 U.S. at 72 & n. 4; Boyde v. California, 494 U.S. 370, 380 (1990).

8  However, a determination that there is a reasonable likelihood that the jury has applied the

9  challenged instruction in a way that violates the Constitution establishes only that an error has

10  occurred.  Calderon v. Coleman, 525 U.S. 141, 146 (1998).  If an error is found, the court also

11  must determine that the error had a substantial and injurious effect or influence in determining the

12  jury's verdict before granting habeas relief.  Id. at 146-47 (citing Brecht v. Abrahamson, 507 U.S.

13  619, 637 (1993)).

14      In determining whether instructional error warrants habeas relief, a habeas court must

15  consider "'whether the ailing instruction by itself so infected the entire trial that the resulting

16  conviction violates due process' ... not merely whether 'the instruction is undesirable, erroneous,

17  or even universally condemned.'"  Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (quoting Cupp

18  v. Naughten, 414 U.S. 141, 146-47 (1973)); California v. Roy, 519 U.S. 2, 5 (1996).  The burden

19  of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral

20  attack on the constitutional validity of a state court's judgment is even greater than the showing

21  required to establish plain error on direct appeal.  Hanna v. Riveland, 87 F.3d 1034, 1039 (9th

22  Cir. 1996).

23          c.  Analysis

24      As an initial matter, Respondent contends that the claim is procedurally barred because no

25  contemporaneous objection was made at trial.  The Court agrees.

26      A federal court will not review a claim of federal constitutional error raised by a state

27  habeas petitioner if the state court determination of the same issue "rests on a state law ground

28  that is independent of the federal question and adequate to support the judgment."  Coleman v.

1    Thompson, 501 U.S. 722, 729 (1991).  This rule also applies when the state court's determination

2    is based on the petitioner's failure to comply with procedural requirements, so long as the

3    procedural rule is an adequate and independent basis for the denial of relief.  Id. at 730.  For the

4    bar to be "adequate," it must be "clear, consistently applied, and well-established at the time of

5    the [ ] purported default."  Fields v. Calderon, 125 F.3d 757, 762 (9th Cir. 1997).  For the bar to

6    be "independent," it must not be "interwoven with the federal law."  Michigan v. Long, 463 U.S.

7    1032, 1040-41 (1983).  If an issue is procedurally defaulted, a federal court may not consider it

8    unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the

9    alleged violation of federal law, or demonstrate that failure to consider the claims will result in a

10   fundamental miscarriage of justice.  Coleman, 501 U.S. at 749-50.

11        In Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002), the Ninth Circuit held that

12   California's contemporaneous objection doctrine is clear, well-established, and has been

13   consistently applied when a party has failed to make any objection to the admission of evidence.

14   In Vansickel v. White, 166 F.3d 953 (9th Cir. 1999), the Ninth Circuit held that the

15   contemporaneous objection bar is an adequate and independent state procedural rule.  It is

16   undisputed that Petitioner did not challenge the instruction during trial.  Further, Petitioner has

17   not demonstrated cause for the default or actual prejudice resulting therefrom.  Thus, the claim is

18   procedurally defaulted.

19        In any case, the claim is without merit.  The state court determined that the jury had been

20   adequately instructed on causation as a matter of California law.  The state court decision is not

21   subject to federal habeas review.  Bradshaw v. Richey, 546 U.S. 74, 76 (2006) ("a state court's

22   interpretation of state law, including one announced on direct appeal of the challenged conviction,

23   binds a federal court sitting in habeas corpus").

24        Moreover, Petitioner fails to demonstrate that the jury was not adequately instructed on

25   causation.  Despite the fact that the jury was not instructed on the terms "independent intervening

26   cause," it was instructed that it had to find that Petitioner's acts began a chain of events that

27   foreseeably resulted in his accomplice's death, and that the death would not have resulted but for

28   Petitioner's acts.  Since an independent intervening cause is one that is unforeseeable, Petitioner

could not have been found guilty based on an independent intervening cause.  Thus, the claim fails.

### 5.    Jury Instructions on Provocative Act Murder

In his final ground for relief, Petitioner claims that the jury instructions on provocative act murder and the elements of the underlying felony for attempted murder were incorrectly given to the jury.

#### a.    State Court Opinion

The state court rejected the claim as follows:

> Lopez contends the trial court erroneously instructed the jury in two respects. We begin by noting no objection was raised to any of the instructions, and therefore any potential issue has been forfeited. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1260.) On the merits, the argument fails as well.

> **Failure to instruct on attempted murder**

> Lopez asserts that since the prosecution theorized that he and Valles were attempting to murder Bargas, the trial court was required to instruct the jury with the elements of attempted murder. According to Lopez, the jury was required to find that he attempted to murder Bargas before it could convict him of provocative act murder. Lopez cites *People v. Cervantes* (2001) 26 Cal.4th 860 (*Cervantes*) as authority for this proposition.

> The issue in *Cervantes* was causation, not jury instructions. Cervantes, a gang member, was at a party with other members from his gang, as well as individuals who were members of another gang. The two gangs generally coexisted peacefully. Cervantes approached a young woman who rebuffed his advances. Cervantes called the woman a foul name, which caused a member of the other gang to challenge Cervantes. A third man, also a member of the other gang, intervened in an attempt to prevent a conflict. Guns were drawn and Cervantes shot the third man.

> Cervantes and his fellow gang members fled. The rival gang shot and killed a member of Cervantes's gang as the victim drove away from the party.

> Cervantes was found guilty of murder based on the provocative act murder doctrine. The Supreme Court concluded the evidence was insufficient as a matter of law to support the conviction because the murder of the victim "by other parties was itself felonious, intentional, perpetrated with malice aforethought, and directed at a victim who was not involved in the original altercation between [Cervantes and the third man]." (*Cervantes, supra*, 26 Cal.4th at p. 874.)

> Nowhere in the opinion does the Supreme Court state, or even suggest, the trial court was required to instruct the jury with the elements of the crime Cervantes allegedly was attempting to commit before it could find him guilty of murder. Instead, the jury in *Cervantes* was instructed in terms essentially equivalent to the instructions provided to the jury in this case.[N.3] (*Compare Cervantes, supra*, 26 Cal.4th at p. 864, fn. 6 with CALCRIM No. 560.)

27

[N.3] The *Cervantes* jury was instructed with the elements of the crime of attempted murder because Cervantes was charged with the attempted murder of the third man. This fact does not change our analysis.

We also reject Lopez's attempt to analogize burglary and aider and abettor liability. Burglary consists of the entry into a structure with the intent to commit a grand or petit larceny or any felony. (§ 459.) A burglary occurs regardless of whether the felony is committed. (*People v. Montoya* (1994) 7 Cal.4th 1027, 1041-1042.) The trial court is required to instruct the jury with the "target offense" and instruct on the elements of the crimes. (*People v. Hughes* (2002) 27 Cal.4th 287, 348-349.) The reason for this is that if the defendant did not have any felonious criminal intent, then a burglary did not occur. For example, a defendant may enter into a building with the intent to commit an offense that is classified as a misdemeanor or acts not punishable as crimes. If there is evidence of multiple objectives, then the failure to instruct the jury which crimes are felonies, and the elements of those crimes, would permit the jury to "indulge in unguided speculation as to what kinds of criminal conduct are serious enough to warrant punishment as felonies and incorporation into the burglary statute." (*People v. Failla* (1966) 64 Cal.2d 560, 564.)

Lopez was charged with the crime of murder even though he did not shoot Valles. Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Malice may be either express or implied. (§ 188.) Malice is implied where "no considerable provocation appears, or when the circumstance attending the killing show an abandoned and malignant heart." (*Ibid.*) "The provocative act murder doctrine was originally conceived as a form of implied malice murder," and applies where the defendant causes a third party to kill in response to the defendant's life-threatening provocative acts. (*Cervantes, supra*, 26 Cal.4th at p. 867.) The doctrine also implicates the concept of causation, since the death is caused by an intervening act, e.g., the third person killing the victim. As explained in *Cervantes*, however, when the doctrine applies, the third party's act is a dependent intervening cause that does not break the chain of causation. (Id. at pp. 868-872.)

These concepts are incompatible with the burglary analysis. Burglary requires the defendant to harbor the specific intent to commit larceny or a felony, and the prosecution must prove the defendant harbored that intent when he entered the structure. Murder does not require the intent to commit a felony, but does require the defendant possess malice. When the provocative act murder doctrine is at issue, the prosecution seeks to prove malice and at the same time establish a dependent intervening cause by proving the defendant provoked the deadly response by a third party by intentionally committing an act with conscious disregard for life. (*Concha, supra*, 47 Cal.4th at pp. 665-666.) Therefore, the underlying felony is not an element of the crime, and the jury need not be instructed on the elements of that crime.

The same analysis holds true when considering aider and abettor liability. Section 31 includes those who aid and abet a crime in the definition of principals of the crime, and the same liability attaches whether one is the perpetrator or aids and abets the crime. (*Montoya, supra*, 7 Cal.4th at pp. 1038-1039.) To establish a defendant is liable as one who aided and abetted a crime, the People must prove (1) a perpetrator committed the crime, (2) the defendant knew the perpetrator intended to commit the crime, (3) the defendant intended to aid and abet the crime, and (4) the defendant's words or acts aided and abetted the crime. (CALCRIM No. 401.) Common to every element of a defendant's liability is the concept that the

28

perpetrator committed a crime. The jury must be instructed with the elements of the underlying offense to determine if a crime was committed. Therefore, the underlying felony is an element of the defendant's liability, which, as explained above, is not the case in this prosecution.

Even if we were to assume, arguendo, that the jury should have been instructed with the elements of attempted murder, reversal would not be required because Lopez cannot establish that a miscarriage of justice occurred. (Cal. Const., art. VI, § 13.) A miscarriage of justice occurs where, after examination of the entire cause, we conclude it is reasonably probable that a result more favorable to the appealing party would have been reached if the error had not occurred. (*People v. Watson* (1956) 46 Cal.2d 808, 836.)

Here, the evidence was overwhelming that Lopez and Valles entered the tattoo shop to murder Bargas. Numerous witnesses testified the Nortenos decided Bargas was "no good" and the consequences to a person who has that label. Bargas described the prior beating he received because of the label. Several witnesses described the confrontation two days before the shooting and that Bargas wounded Daniel Lopez, who was related to Lopez. Bargas and Wernicke described Lopez's conduct in the tattoo shop on the day of the shooting that caused Bargas"s response, including Lopez's withdrawing a firearm from his waistband. The only logical inference that could be made from this evidence is that Lopez and Valles went to the tattoo shop to murder Bargas and were unsuccessful only because Bargas was armed and defended himself.

The only evidence offered that differed from the above was the testimony of Lopez himself. According to Lopez, he went to the tattoo shop to attempt to ensure there would not be any future violence between Bargas and Daniel Lopez. He was unarmed, and Valles drew his weapon only after Bargas started the gunfire. Lopez testified he fired at Bargas in self-defense. If the jury believed Lopez's testimony, it would have found him not guilty of the charged crime. Because the jury found him guilty of the murder of Valles, the jury necessarily rejected Lopez"s testimony.

Since the only testimony believed by the jury established that Lopez entered the tattoo shop armed and with the intent to injure or kill Bargas, there is no possibility that had the jury been instructed with the elements of attempted murder, Lopez would have obtained a better outcome. Accordingly, reversal is not required under any standard of review.

(Resp't's Answer, Ex. A, pp. 26-30.)

        b.  Federal Standard

The standard of review for instructional error is set forth in Ground Four, *supra*.

        c.  Analysis

Respondent contends the claim is procedurally defaulted because Petitioner failed to make a contemporaneous objection at trial. For the same reasons set forth in Ground Four, *supra*, the Court agrees that the claim is procedurally defaulted. In addition, the state court determined that the crime of attempted murder is not an element of the provocative act murder doctrine.

1   Therefore, it was not necessary to instruct the jury on the elements of attempted murder.  This

2   Court is bound by the state court's determination on what constitutes the crime of provocative act

3   murder under California law.  Bradshaw, 546 U.S. at 76.  Even if it were necessary for the jury to

4   be instructed with the elements of attempted murder, there was overwhelming evidence that

5   Petitioner and Valles entered the tattoo parlor with the intent to murder Bargas.  Therefore, even

6   if error occurred, it could not have had a substantial and injurious effect or influence on the jury's

7   verdict.

8   **V.      RECOMMENDATION**

9       Accordingly, the Court **RECOMMENDS** that the Petition for Writ of Habeas Corpus

10  (Doc. 1) be **DENIED** with prejudice.

11      This Findings and Recommendation is submitted to the United States District Court Judge

12  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the

13  Local Rules of Practice for the United States District Court, Eastern District of California.  Within

14  twenty-one days after being served with a copy of this Findings and Recommendation, any party

15  may file written objections with the Court and serve a copy on all parties.  Such a document

16  should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies

17  to the Objections shall be served and filed within ten court days (plus three days if served by

18  mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling

19  pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections

20  within the specified time may waive the right to appeal the Order of the District Court.  Martinez

21  v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

22

23  IT IS SO ORDERED.

24      Dated:    **November 8, 2016**           **/s/ Jennifer L. Thurston**
                                                 UNITED STATES MAGISTRATE JUDGE
25

26

27

28

                                    30